# In the United States Court of Federal Claims
No. 15-885C
(Filed: March 16, 2016)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| NOVA GROUP/TUTOR-SALIBA, A Joint Venture,<br><br>               Plaintiff,<br><br>    v.<br><br>THE UNITED STATES,<br><br>               Defendant. | Rule 12(b)(6); Motion to Dismiss; Constructive Change; Timely Written Notice; FAR 52.243-4; Actual Notice; Extenuating Circumstances Excusing Timely Written Notice. |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    Gerald Scott Walters and Steven L. Reed, Smith Currie & Hancock, LLP, 2700 Marquis One Tower, 245 Peachtree Center Avenue, NE, Atlanta, GA 30303, for Plaintiff.

    Benjamin C. Mizer, Robert E. Kirschman, Jr., Steven J. Gillingham, and Adam E. Lyons, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

## OPINION AND ORDER

**WILLIAMS**, Judge.

    This Contract Disputes Act case comes before the Court on Defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiff, a joint venture, entered into a contract with the Naval Facilities Engineering Command ("NAVFAC"), a component of the United States Navy, to design and build a pier at the Puget Sound Navy Shipyard in Bremerton, Washington. Plaintiff alleges two constructive changes and seeks $1,881,900, plus interest.

    Defendant argues that Plaintiff's claim is barred because Plaintiff failed to give written notice of its constructive change claim within 20 days as required by FAR 52.243-4. Because Plaintiff has plausibly alleged that the Government had actual knowledge of the facts giving rise to its changes claim, Defendant's motion to dismiss is denied.

## Background

On May 2, 2008, NAVFAC awarded Contract No. N44255-08-C-6000 to Plaintiff Nova Group/Tutor-Saliva ("NTS"). Compl. 1. The contract encompassed the design and construction of a new ship repair wharf ("Pier B") at the Puget Sound Navy Shipyard in Bremerton, Washington. NTS was required to complete work within 1,345 calendar days, and the contract included a liquidated damages clause imposing $35,475 per day for delay past the contract deadline. Id. at ¶¶ 8, 10.

The contract granted NTS and its subcontractors discretion in choosing the method of analyzing forces upon the pier's piles. Id. at ¶ 20. The "Designer of Record" for NTS, KPFF Consulting ("KPFF"), selected the American Concrete Institute Building Code Requirement for Structural Concrete, 2005 version ("ACI 318-05") and chose to analyze and confirm global stability using ACI 318-05, Section 10.13.6(a). NTS transmitted four design submittals to NAVFAC at various phases, and NAVFAC in turn provided NTS with 382 design review comments. Id. at ¶¶ 23-24. None of NAVFAC's 382 design review comments addressed the global stability of Pier B's piles or the NTS designer's choice of determining global stability using ACI 318-05, Section 10.13.6(a). Id. at ¶ 25. NAVFAC approved the last of NTS's Pier B design submissions on November 12, 2009, including the structural design of Pier B. Id. at ¶ 26.

More than five months after the last design was approved, NAVFAC's construction manager, in a March 8, 2010 letter, questioned NTS's design compliance with the contract, stating:

> Based on the attached BergerABAM correspondence dated 12 February 2010, the Navy has concerns that the final approved design, relying heavily upon a SAP 2000 model with respect to the performance design loads, may not be in conformance with the RFP when considering global stability and the observed out of tolerance piles.

Id. at ¶ 41, Ex. 2.

The cited memorandum from the Government engineer, BergerABAM, questioned KPFF's chosen analytics method, stating in pertinent part:

> ISSUES RELATED TO EFFECTIVE LENGTH FACTORS
>
> There are three related issues that became the focus of our review of the use of effective length factors for Pier B.
>
> * * *
>
> 3. The design approach did not include a check for overall stability of Pier B for load combinations based on the RFP provisions. Use of provisions from the 2005 Building Code Requirements for Structural Concrete by the American Concrete Institute (ACI 318-05) is a design requirement for Pier B and addresses stability. Reference to ACI 318-05 as a design requirement is found in the basis of design by KPFF.

* * *

> KPFF maintains the evaluation of ACI 318-05 Section 10.13.6a demonstrates the pier satisfies sidesway buckling under gravity load condition. However, this particular provision is based on results from an analytical model, which is susceptible to the accuracy of the input properties of geometry and structural characteristics of the physical system. Consequently, BergerABAM contends Chapter 10.13.6c is the more appropriate provision because the geometric properties can be verified, are more apparent, and are directly related to Euler buckling (global instability.) With this evaluation, it appears to satisfy properties generally associated with good engineering practice only under favorable conditions of structural properties.

Id. at Ex. 2.

NAVFAC in its March 8th letter did not direct NTS to stop construction on the Pier. Id. at Ex. 2. However, on the same day, NTS stopped operations and began re-evaluating the Government-approved design. Id. at ¶¶ 44-45. NTS claims that if it had continued construction and the Government's concerns had proven valid, "then NTS could have faced extensive additional corrective construction work." Id. at Ex. 1; Pl.'s Resp. 5. NTS argued that "no reasonably prudent contractor would continue with critical construction in the face of such a notice from the Navy." Compl. Ex. 1. NTS alleges that the Government "knew that NTS had stopped performing critical Pier B construction work" during this re-analysis of the Government-approved design. Id. at ¶ 46. Between March 8 and May 27, 2010, NTS and KPFF participated in meetings with the Government and "furnished detailed reports substantiating NTS's original design." Id. at ¶ 45.

During this period of reanalysis, KPFF hired an independent third-party designer to evaluate the initial Government-approved design. The designer, Ben C. Gerwick, Inc., concluded both that the design satisfied the requirements of the RFP and that ACI 318-05 Section 10.13.6(a) was an appropriate design method. Id. at ¶ 49.

On May 27, 2010, the Government sent NTS a letter containing a second BergerABAM memorandum concluding that the design of Pier B "adequately addressed global stability issues" and finding that it was "technically sufficient" to only consider ACI 318-05, Section 10.13.6(a) and not Section 10.13.6(c). Id. at ¶ 56. NTS resumed work the same day. Id. at ¶ 61.

NTS claims a constructive change based on NAVFAC's decision to question the global stability of Pier B design, due to Government misinterpretation of the Contract Documents - - an "incorrect assumption that NTS had relied on the wrong ACI standard in its global stability calculations." Id. at ¶ 58. NTS further claims misinterpretation of the Contract Documents through NAVFAC's "decision to require NTS to re-evaluate the Pier B pile design based on the unfounded concern that NTS (through KPFF) had not initially evaluated or designed for global stability in accordance with the correct ACI standard." Id. at ¶ 98.

After May 27, 2010, NTS attempted to mitigate construction delays, impacts, and inefficiencies by accelerating the remaining Pier B construction work, adding manpower and

3

equipment and providing for "significant levels of overtime." Id. at ¶¶ 63-64. NTS not only alleged that the Government was notified of this acceleration and overtime, but also that the Government "observed" and "approved" both. Id. at ¶ 64. In a July 21, 2010 letter, the Contracting Officer expressed concern about the construction schedule and reminded NTS of its contractual time obligations. Id. at ¶ 71. NTS alleges that due to decreased efficiency and the resulting constructive acceleration necessitated by the work stoppage, NTS and its subcontractors incurred increased costs to meet the project deadline. Id. at ¶¶ 66-70.

NTS's first written notification to the Contracting Officer of REA No. 14 was by letter dated September 3, 2010, stating in pertinent part:

> REA # 14. GLOBAL STABILITY ISSUES, PIER B
>
> The Government issued Serial No. 0106, dated March 8, 2010 advising of Berger ABAM's concerns that the final approved design may not be in conformance with the RFP. The Government requested that [KPFF] provide analytical models for both CLE [contingency-level earthquake] liquefied and non-liquefied conditions. In addition, detailed example calculations for battered piles were requested. The concern that the design was not in conformance with the RFP required all work on Pier B to be stopped until these issues were resolved. This delay impacted all Pier B work for several months and has required NTS to accelerate the falsework operation to mitigate the delay to the construction schedule.

Id. at Ex. 3. This September 3, 2010 letter did not fully quantify costs incurred since accelerated work was ongoing. Id. at ¶ 76. The Contracting Officer expressed concern about the timeliness of construction in a letter dated November 12, 2010. Id. at ¶ 77.

By letter dated April 1, 2011, NTS submitted quantification of its REA and stated that these costs would not have been incurred "had NTS been able to progress the work according to its baseline plan." Id. at Ex. 4. Almost two years later, on February 5, 2013, the Contracting Officer replied that the Government did not stop NTS' work from March 8, 2010 to May 27, 2010. Id. at ¶ 82. NTS requested a Contracting Officer's Final Decision on REA No. 14 on June 25, 2014. Id. at ¶ 84. On September 4, 2014, the Contracting Officer issued a Final Decision, denying the constructive change claim and stating that NTS had failed to provide written notice "before implementing the stated changes to accelerate the work . . . until 11 months after the costs were incurred," in violation of FAR 52.243-4's 20-day notice requirement. Id. at Ex. 1.

## Discussion

Plaintiff claims that Defendant constructively changed its contract by questioning its design compliance with the RFP during a critical phase of construction, resulting in a work stoppage followed by accelerated construction to meet the contract deadline. Defendant moves to dismiss this action for failure to state a claim upon which relief can be granted, arguing that this constructive change claim is precluded by NTS' failure to give timely written notice of the claim as required by FAR 52.243-4.

**Legal Standard**

Pursuant to Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (construing Rule 8 of the Federal Rules of Civil Procedure, which is identical to RCFC 8). The Government, as movant, must establish that the facts asserted by, and construed in favor of, the pleader, do not entitle the pleader to a legal remedy. Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002); E&E Enters. Glob., Inc. v. United States, 120 Fed. Cl. 165, 171 (2015).

It is well settled that a complaint should be not be dismissed under RCFC 12(b)(6) when a complaint contains facts sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. This plausibility standard requires more than a "sheer possibility" that the defendant has violated the law. Id.

Under the constructive change doctrine, the Government is liable for additional work caused by a constructive change to the contract. See Aydin Corp. v. Widnall, 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change"). For a claim to succeed under the theory of constructive change, a plaintiff "must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." Bell/Heery v. United States, 739 F.3d 1324, 1335 (Fed. Cir. 2014) (citing The Redland Co. v. United States, 97 Fed.Cl. 736, 755–56 (2011)).

**Lack of Timely Written Notice Does Not Warrant Dismissal of Plaintiff's Claim**

NTS alleges that under FAR 52.243-4, the Government's March 8, 2010 letter constructively changed the contract by halting Pier B work for over two months while NTS re-evaluated the design and thereafter expedited work to meet the contract deadline. FAR 52.243-4 states in pertinent part:

> If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However . . . no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required.

48 C.F.R. § 52.243-4(d) (2007). According to the Contracting Officer's final decision, written notice "allows the Government to clarify and/or reverse any incorrect or misunderstood direction and allows the Government the ability to execute the correct contractual processes and mitigate cost and/or impacts." Compl. Ex. 1. Timely written notice differentiates requests the contractor views as outside the scope of the contract from those that are incorporated into the contract. See Singer Co. Librascope Div. v. United States, 568 F.2d 695, 711 (Ct. Cl. 1977). In so

differentiating, the Government can account for "what amounts it might be on the hook for, so that it will not be surprised by money claims later." K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1010 (Fed. Cir. 2015).

NTS' failure to provide formal written notice of its increased costs within 20 days as required by FAR 52.243-4 does not require dismissal of Plaintiff's complaint. Plaintiff plausibly alleged that the Government had actual knowledge of the work stoppage and ensuing acceleration giving rise to the constructive change claims. NTS alleges that the Government knew "that NTS had stopped performing critical Pier B construction work" during the design re-analysis by the Government's engineer. Compl. ¶ 46. Between March 8 and May 27, 2010, the period of work stoppage, NTS and its designer of record, KPFF, participated in meetings with the Government and furnished detailed reports and correspondence substantiating NTS' original design. Id. at ¶ 45. NTS expressly alleged that the Government observed and approved the acceleration and added manpower, equipment, and overtime. Id. at ¶ 64. Specifically, Plaintiff alleged that after May 27, 2010, NTS attempted to "mitigate construction delays, impacts, and inefficiencies" by accelerating the remaining Pier B construction work, adding manpower and equipment, and providing for "significant levels of overtime, of which the government was notified, of which the government observed, and of which the government approved." Id. at ¶¶ 63-64.

Defendant argues that the decision by the United States Court of Appeals for the Federal Circuit in K-Con is dispositive and requires this Court to dismiss the complaint. In that case, the Coast Guard awarded K-Con a construction contract, which included a liquidated damages clause, for a "cutter support team building." During construction, the Coast Guard requested that the building's eave height be increased by four inches and other changes based upon its review of K-Con's design submissions. K-Con "repeatedly expressed its intent to incorporate the Coast Guard's requests as though they were consistent with the terms of the contract," in effect acquiescing to these Government requests. K-Con failed to provide adequate written notice until two years after the changes were allegedly ordered. K-Con, 778 F.3d at 1010. The Court determined that failure to give timely written notice required dismissal of K-Con's constructive change claim, reasoning that a request for remuneration two years later far exceeded the 20-day written notice period and prevented the Government from making an educated choice about how to handle the request for a compensable change at the time when alternative options were still available. Id. at 1010-11.

K-Con is readily distinguishable from the situation here. Unlike the plaintiff in K-Con, NTS did not acquiesce in the Government engineer's design interpretation that allegedly required a work stoppage and subsequent acceleration. Instead, Plaintiff's designer of record hired a third-party designer who concluded that KPFF's chosen ACI design method was appropriate. Ultimately, the Government proceeded with Plaintiff's originally submitted design which it had approved months earlier.

Importantly, Plaintiff's allegation that the Government knew about both the work stoppage and acceleration falls within an exception to the 20-day notice requirement adopted by the Federal Circuit in K-Con. Specifically, the K-Con Court expressly recognized that extenuating circumstances such as the Government's actual or imputed notice of circumstances

giving rise to the claim "have weighed against strict enforcement of the time limit" imposed by FAR 52.243-4. 778 F.3d at 1010. As the Federal Circuit explained:

> Sometimes, extenuating circumstances have weighed against strict enforcement of the time limit. See generally Powers Regulator Co., GSBCA No. 4668, 80–2 BCA ¶ 14,463 (Apr. 30, 1980) (reviewing how the time limit has been enforced by boards of contract appeals and enumerating exceptions to its strict enforcement); see also Hoel–Steffen Const. Co. v. United States, 197 Ct. Cl. 561, 456 F.2d 760 (1972) (noting that a "severe and narrow application of the notice requirements [of the suspension clause in the then-extant Federal Procurement Regulations] . . . would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the Government is quite aware of the operative facts").

Id. (alterations in original).

This case falls squarely within the exception to strict enforcement of the 20-day notice requirement where the Contracting Officer is on notice of the circumstances giving rise to the claim. NTS alleged that the Contracting Officer had actual knowledge of the facts leading to the constructive change. It was the Government that issued the March 8, 2010 letter raising design issues five months after the Government had approved NTS' design. Plaintiff responded by hiring a third-party designer to conduct an investigation, who ultimately affirmed Plaintiff's original design. Plaintiff plausibly alleged that at all times during this re-analysis, the Government knew that NTS had stopped performing critical Pier B construction work and that the Government observed and approved the significant extra work during acceleration. See Calfon Constr. Inc. v. United States, 18 Cl. Ct. 426, 438-39 (1989), aff'd, 923 F.2d 872 (Fed. Cir. 1990) (stating "[i]f the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decision-making, the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs").

In short, Plaintiff alleged facts plausibly indicating that the Government was quite aware of the purported constructive changes that were occurring at Pier B. Indeed, it would have been strange for the Government not to have known of a work stoppage for over two months followed by acceleration prompted by the Government's warnings about schedule slippage. As such, the lack of timely written notice does not warrant dismissal of this action.

## Conclusion

Defendant's motion to dismiss is **DENIED**. The Court will convene a telephonic status conference on **April 12, 2016, at 2:00 p.m. E.D.T.** to schedule further proceedings in this matter. The Court will initiate the call.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**
